UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------- X

UNITED STATES OF AMERICA,　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　-against-　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:　　　**OPINION & ORDER**
PRINCE GEORGE,　　　　　　　　　　　:　　　11-CR-250 (DLI)
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendant.　　　:
---------------------------------------------------- X

**DORA L. IRIZARRY, U.S. District Judge:**

On July 20, 2011, defendant Prince George ("Defendant" or "George") was convicted, after a trial by a jury, of importation of cocaine and possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 952(a) and 841(a)(1). On August 17, 2011, Defendant timely moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"), or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33"). (*See* Dkt. Entry No. 50, Def. Prince George's Mot. and Mem. of Law in Supp. of a J. of Acquittal or a New Trial ("Def. Mem.").) On October 11, 2011, the court heard arguments on Defendant's motions, but reserved judgment pending this written Opinion and Order. For the reasons set forth below, Defendant's Rule 29 and 33 motions are denied.

## I.　　THE TRIAL

A jury trial was held from July 18, 2011 to July 20, 2011. U.S. Customs and Border Protection ("CBP") Officers Stephen Mackesy ("Officer Mackesy" or "Mackesy") and Frederico Ramirez ("Officer Ramirez" or "Ramirez"), as well as U.S. Department of Homeland Security ("DHS") Special Agents Christian Albanese ("Special Agent Albanese" or "Albanese") and Tara Mulkearns ("Special Agent Mulkearns" or "Mulkearns"), an expert in international narcotics smuggling and narcotics pricing, testified on behalf of the government. Mr. Quentin Moore

("Moore"), Mr. Gregory Wint ("Wint") and Ms. Marissa George ("Marissa"), George's daughter, testified on George's behalf. George also testified on his own behalf.

    A. *The Government's Case*

       i. <u>The Arrest</u>

On March 1, 2011, George arrived at John F. Kennedy International Airport ("JFK"), in Queens County, New York, aboard a Caribbean Airlines flight, which originated from Port of Spain, Trinidad. (Trial Transcript ("Tr.") at 34, 101, 103.) On that same date, Officer Mackesy was on duty at JFK as a member of the Passenger Enforcement Roving Team. (Tr. at 33-34.) While on patrol, Mackesy saw George near the baggage carousels in Terminal 4 of JFK. (Tr. at 34-35.) George was walking alone, carrying a backpack and a rolling suitcase. (Tr. at 36.) Mackesy approached George, stopped him for a random inspection, and began asking questions. (*Id.*) In response to Mackesy's questions, George stated he had arrived from Trinidad and Tobago ("Trinidad"); the bags he carried were his own; and he packed them himself. (Tr. at 37, 299.) Mackesy further inquired whether George had any food in his luggage and George responded that he did not. (Tr. at 49-50.) Mackesy then asked George to produce a passport and customs declaration and George complied. (Tr. at 38.) George's passport showed he had recently entered Trinidad on February 23, 2011, and that he had last entered Trinidad on May 13, 1997. (Tr. at 40-42.) On the customs declaration form, George marked that he had not brought any food with him from Trinidad. (Tr. at 43-44.)

After this conversation, Mackesy escorted George to a baggage examination area and asked George to produce a baggage receipt claim. George again complied. (Tr. at 50.) George's name was written on the baggage receipt claim and the receipt indicated that George checked the bags himself in Trinidad. (Tr. at 52-53.) Mackesy then asked George to place his

bags on a baggage examination table.  (Tr. at 54.)  George followed Mackesy's directions, and at this point, Mackesy did not notice anything unusual about George's demeanor.  (Tr. at 54.)  Mackesy began to search George's rolling suitcase, wherein he found clothing, toiletries and two or three bags of fruit jam, which gave off a noticeable fruit smell.  (Tr. at 54-55.)   Mackesy asked George what was in the bags.  Despite having previously told Mackesy there was no food in his luggage, and despite indicating the same in his customs declaration, George responded that the bags contained mango preserves.  (Tr. at 55.)   Had George indicated on his customs declaration that he brought food into the country, CBP would have referred his luggage to an agricultural specialist and his luggage automatically would have been X-rayed.  (Tr. at 56.)

Mackesy then emptied out the entire contents of George's suitcase and noticed that the suitcase was still heavy.  (Tr. at 57.)  Mackesy unzipped the liner of the suitcase and felt the bottom of the case; he noticed it was thicker than usual and lumpy in certain areas.  (Tr. at 57.)  Mackesy picked up the luggage, shook it to feel the weight, and thought it was heavier than usual for a suitcase of its size.  (Tr. at 58.)  Mackesy began to place the clothing back in the suitcase, but he grew suspicious and emptied it again.  (Tr. at 58.)   At this point, Mackesy noticed George's demeanor change – he became visibly nervous and began talking very quickly.  (*Id.*)  George asked Mackesy questions regarding the weather and he commented on how strange it was for him to have been back in Trinidad after so many years.  (Tr. at 58-59.)  Up till this point George had not asked any questions.  (Tr. at 59.)  George also stepped up to the table on which his suitcase was placed and started to lean on the table and "hover" over the suitcase.  (Tr. at 59-60.)  Prior to this, George had maintained a distance of approximately one or two feet from the table.   (Tr. at 59).  Mackesy then began to probe the bottom of the re-emptied suitcase with his

knife.  (Tr. at 60.)  Mackesy made a little hole in the suitcase with his knife and he noticed a small amount of white powder come out of the hole onto the knife.  (Tr. at 61.)

Mackesy called for the assistance of his supervisor, Officer Ramirez.  (Tr. at 62, 81, 83.) Ramirez, along with other officers, immediately responded.  (Tr. at 62.)  Mackesy had a brief discussion with Ramirez, after which Ramirez also inspected the luggage, noticed it appeared about six pounds heavier than usual, and created a larger hole in the luggage with his own knife for closer inquiry.  (Tr. at 63, 85, 87.)  Mackesy observed more white powder fall out of the hole created by Ramirez and noticed the smell of fuel emanating from the suitcase.  (Tr. at 63.) Mackesy testified that, based on his training, this smell was consistent with cocaine.  (*Id*.)  At this point, George hung his head down and did not say a word.  (*Id*.)  The CBP officers then gathered George's luggage and escorted him to a private search room.  (Tr. at 64.)

Once in the room, the officers peeled back the side of the luggage and found two plastic bags of white powder, covered in electrical tape, in the interior of the luggage's siding. (Tr. at 64-66.)  The officers immediately tested the white powder and it tested positive for cocaine.  (Tr. at 66.)  Mackesy placed George under arrest and contacted agents from the Department of Homeland Security ("DHS").  (Tr. at 70-71.)  DHS agents arrived and took custody of George, his personal effects, his suitcase and the bags of cocaine.  (Tr. at 71, 95.)

ii.  Special Agent Albanese

Special Agent Albanese testified that DHS took custody of the following property found on George's person: (1) his Maryland driver's license, which listed a Baltimore address; (2) a Greyhound bus itinerary, listing George as the passenger, and showing a departure from Baltimore at 11:05 p.m. on February 22, 2011 and an arrival at New York City at 2:40 a.m. on February 23, 2011; (3) George's Caribbean Airlines itinerary for his February 23, 2011 to March

1, 2011 trip to Trinidad, showing the trip cost $798.80, was paid for by credit card, and was booked on February 16, 2011; (4) a second Caribbean Airlines itinerary listing the passenger's name as Quentin Moore, but otherwise reflecting the exact same travel information, cost, and source of payment as the itinerary in George's name. (Tr. at 97-100, 101-107.) Investigators determined that an individual named Gregory Wint purchased George and Moore's tickets with a credit card on February 16, 2011. (Tr. at 133, 144-145.)

DHS also took custody of the following property found on George's person: (1) a business card for Moore, showing he worked at the AT&T Inner Harbor branch store in Baltimore, Maryland; (2) a letter addressed to George from the Ministry of Finance in Trinidad, stating that George had outstanding liabilities in the amount $10,794.44; (3) a Virgin Mobile cellphone and an iPhone. (Tr. at 146-49.) Investigators searched George's iPhone and discovered multiple text messages exchanged between George's iPhone and a cellphone subscribed to by Gregory Wint. (Tr. at 149, 154-57.) The dates of the text messages correspond to dates of George's trip to Trinidad. (Tr. at 154-55.) Included among the texts were two messages sent from Wint to George stating "Call me when reach." and "Call B 1(868)294-0528 or 344-8649." (Tr. at 158.) Area code "868" is assigned to the country of Trinidad. (*Id.*)

Also included among George's personal effects that DHS took custody of were: (1) a receipt in George's name for a massage, dated February 15, 2011; (2) an AT&T store receipt for $151.30 from the Inner Harbor branch store in Baltimore, Maryland, in the name of PMG Construction Consulting, with the cashier listed as Quentin M., dated February 11, 2011; (3) a receipt in George's name from bMobile, dated February 25th, 2011, for a prepaid 100-dollar phone plan; (4) a Baltimore Credit Union ATM card in George's name; and (5) a Bank of America debit card, in the name of Prince McCathy George, PMG Construction. (Tr. at 160-63.)

During cross-examination, Albanese testified that she investigated George's travel history and determined he had last traveled thirteen or fourteen years before the date of his arrest. (Tr. at 169.) Albanese also stated that she reviewed George's passport history and determined that he previously had a B1/B2 tourist visa, which allows a tourist to stay in the United States for six months. Albanese testified that if a person with a B1/B2 visa stays in the United States beyond six months and subsequently leaves the country, that person would not be granted re-entry if they attempted to return. (Tr. 169-70.) George obtained a permanent resident card on October 15, 2009, after which he was eligible to leave and return to the United States freely. (Tr. at 170.)

Albanese also testifed that DHS recovered additional property from George when he was arrested at JFK, including two birth certificates from Trinidad and Tobego. (Tr. at 174.) The first was for Michael McCathy and it listed the father as Prince McCathy George. (Tr. at 174-75.) The second was for Marissa Natalie, and, it also listed the father as Prince George. (Tr. at 175.) Both birth certificates were issued on February 28, 2011, the day before George returned to the United States from Trinidad. (Tr. at 175.) Albanese also testified that the letter addressed to George from the Ministry of Finance in Trinidad was dated February 4, 2011, which was approximately two week before George's ticket was purchased. (Tr. at 176.)

### iii. Special Agent Mulkearns

The parties stipulated that the suitcase found in George's possession contained 1.876 kilograms of cocaine, with a purity level of 55.5 percent. (Tr. at 192-93.) Special Agent Mulkearns was qualified as an expert witness in the methods of international narcotics smuggling and narcotics pricing. (Tr. at 186-87.) Mulkearns testified that 1.8 kilograms of cocaine is an amount that would be used for distribution and not for personal consumption. (Tr.

at 195.)  She opined the wholesale value of the cocaine was approximately $56,000 and the street value was approximately $124,000.  (Tr. at 195-96.)

According to Mulkearns, cocaine is routinely smuggled from Trinidad into the United States through a variety of methods, including, concealed in the rails or side panels or a compartment inside a drug courier's bag.  (Tr. at 197-98.)  She testified that drug trafficking organizations frequently purchase airline tickets for drug couriers a week or two before a departure date.  (Tr. at 198-99.)  Drug trafficking organizations also frequently send two couriers on a trip, because a person travelling alone can attract more attention from law enforcement.  (Tr. at 200.)  She also testified that sometimes tickets will be booked for two people but that only one person will actually travel.  (*Id.*)

During cross-examination, Mulkearns testified that drug traffickers frequently purchase airline tickets for couriers in cash to conceal the drug traffickers' identities and that couriers typically do not know the names of the persons who purchased their ticket.  (Tr. at 204-05.)  She also testified that couriers are often told not to appear nervous in public to avoid attention from law enforcement.  (Tr. at 207.)  During re-direct examination, Mulkearns testified that she had personally investigated several cases in which a courier's air fare had been paid for with a credit card.  (Tr. at 212-13.)  After Mulkearns' testimony, the government rested.  (Tr. at 215.)

### B.  The Defendant's Case

#### i.  Quentin Moore

Quentin Moore testified that he and George are friends and that, in February of 2011, they decided to take a trip together to Trinidad to participate in the carnival festival.  (Tr. at 221-22, 224.)  According to Moore, they planned the trip two weeks in advance and George lent Moore the money to pay for his ticket.  (Tr. at 223-24.)  The day before the trip Moore told

George he could no longer go because he was unable to take time off from work and because his daughter was sick.  (Tr. at 225.)  Moore told George he would reimburse George for the ticket.  (*Id*.)  Moore also stated he and George never discussed transporting drugs from Trinidad.  (Tr. at 226.)

During cross-examination, Moore repeated that George told him the purpose of their trip was to celebrate carnival and that they would be in Trinidad from February 23 till March 1. (Tr. at 228, 230.)  The government asked Moore if he was aware that carnival was scheduled to take place the second week in March.  (*Id*.)  Moore responded "Correct, and as I stated, any country that celebrates carnival is always [sic] carnival."  (*Id*.)  Moore also conceded that when he was interviewed by investigators in June of 2011, he told them that George said he would pay for Moore's ticket.  (Tr. at 231.)  The government asked Moore whether he was aware that Moore's ticket was actually paid for by an individual named Gregory Wint.  (Tr. at 232.)  Moore testified that he did not know anyone named Gregory Wint.  (*Id*.)  Moore also testified he was good friends with George, but he did not know George's age or birthday.  (Tr. at 233-34.)

## ii. Gregory Wint

Gregory Wint testified that he was born in Tobago and that he became friends with George in Trinidad when George was 15 years old.  (Tr. at 239, 241.)  Wint moved to Brooklyn, New York in 1990 and he became a maintenance worker at Beth Israel Hospital.  (Tr. at 241-42.)  At the time of his testimony, Wint had worked at the hospital for approximately fourteen years.  (Tr. at 242.)  Wint and George reunited after George moved to Brooklyn.  (Tr. at 241-42.)  Wint testified that, in February of 2011, George asked Wint to purchase airline tickets for him and Moore and that George promised to pay Wint back for both tickets.  (Tr. at 247-48.)  According

to Wint, he lent George money on other occasions and George always paid him back. (Tr. at 247.) Wint also testified that he did not know Quentin Moore. (*Id*.)

George made the travel arrangements and Wint went to JFK to purchase the tickets. (Tr. at 248.) George then came to Wint's house alone, at approximately 4:00 a.m. on the morning he was to travel, and picked up the tickets. (Tr. at 248-49.) George told Wint that Moore was no longer going on the trip. (Tr. at 249.) Wint told George that he would not have to pay Wint for Moore's ticket, because Wint might use it to travel to Trinidad later that year. (Tr. at 249-50.) At the time of trial, George had repaid Wint $450 for his airline ticket. (Tr. at 250.)

Wint also testified as to certain cellular phone text messages he sent from his phone to George's phone. While George was in Trinidad, Wint sent a text to George's phone with the message "Call the B." (Tr. at 251.) Included in that text message were the phone numbers of Wint's brother and nephew, both of whom live in Tobago. (Tr. at 252.) According to Wint, he asked George to bring "the bottom part of a mop stick" to Wint's brother. (*Id*.) Wint explained he asked George to do this because Wint's brother uses mops in his business, but his old mop sticks kept breaking, so Wint promised to send his brother a new mop stick. (Tr. at 252-53.) Wint also sent a second text to George's phone with the message "Call when you reach." (Tr. at 253.) Wint explained that he wanted George to call him to confirm that he had made contact with Wint's brother and that the message "was just telling [George] to call me so I know that the stuff was dropped off." (*Id*.) Wint also testified that he did not hire George to transport drugs to Trinidad nor did he ever discuss transporting drugs with George. (*Id*.) Finally, Wint testified that he had never known George to be involved in any drug related activity. (Tr. at 253-54.)

During cross examination, Wint testified that each ticket he purchased cost $800 and that he purchased the tickets in George's and Moore's names less than one week before the travel

dates.  (Tr. at 256-57.)  Wint made the entire $1,600 purchase on his MasterCard, which has a credit limit of $3,500.  (Tr. at 257.)  Wint again confirmed that he purchased the ticket for Moore even though he had never met Moore.  (Tr. at 258.)

iii.  Prince George

George testified that he checked in the suitcase containing the cocaine at the airport in Trinidad on his return to JKF, but that he was not the owner of the suitcase.  (Tr. at 267.)  George explained that his original suitcase ripped when he arrived at Trinidad, so he borrowed a suitcase from a friend for his return trip.  (Tr. at 267-68.)  George stated he first learned there were drugs in his suitcase on the day he was arrested.  (Tr. at 268.)  George also testified that he was not paid for transporting the suitcase.  (*Id*.)

George grew up in Tobago and completed his education through college.  (*Id*.)  His father was a plumber instructor and the superintendent of all technical schools in the country; as a result, George's family was financially stable.  (*Id*.)  George began working as a plumber when he was nine years old.  (Tr. at 268-69.)  When George was sixteen, after his father passed away, he moved to Trinidad to continue school and he began doing mechanic work.  (Tr. at 269.)  George moved to the United States in 1997 when he was in his early twenties.  (*Id*.)  His fiancé had already moved to the United States with their two children, who were both born in Trinidad.  (Tr. at 269-70.)  George received a visa to come to the United States and he moved to Brooklyn, New York where he was self-employed as a carpenter and plumber.  (Tr. at 270-71.)  George married his fiancé in 1998 and they had a third child who was born in Brooklyn.  (Tr. at 271.)  Sometime later, George acquired a home improvement company where he continued working in carpentry and plumbing.  (Tr. at 271.)

In 2005, George and his wife divorced and he moved from New York to Baltimore, Maryland, where he continued doing home improvement work. (Tr. at 271-72, 273.) In 2006, George obtained a social security card and work authorization. He then started working fulltime as an installer for the Dish Network Satellite Company. (Tr. at 273-74.) In 2009, George began working for Direct TV. Currently he is not working, but is receiving disability benefits owing to injuries he sustained in a car accident. (Tr. at 274.) George lives with his girlfriend, who is a nurse. (Tr. at 276.) She owns a home and earns between $91,000 and $150,000 per year. (*Id*.)

Prior to George's trip in February of 2011, he had not traveled to Trinidad since he left the country in 1997, because of his immigration status. (*Id*.) George obtained his permanent resident card in 2009, but did not travel to Trinidad immediately thereafter because of the medical treatment he was receiving for the injuries he sustained in the car accident. (Tr. at 277.) George testified that he traveled to Trinidad in February of 2011because he learned from his sister that he had an outstanding tax liability in Trinidad and he was concerned, that if he did not settle the matter, a lien would be placed on properties he owned in Trinidad. (Tr. at 277-78.) He also went to Trinidad to obtain birth certificates for his two children who were born there and to visit family members. (Tr. at 279.)

George testified that he planned on traveling to Trinidad with Moore, whom he first met in the AT&T retail store where Moore worked. (Tr. at 280.) Besides addressing his tax bill, George and Moore planned on taking part in the carnival celebrations. (Tr. at 280.) George testified that carnival festivals begin around Christmas time and continue through mid-March. (Tr. at 281.) George stated that Wint lent him the money to pay for the tickets and that Wint has lent George money on other occasions. (Tr. at 281.) George also testified that he expected Moore to pay him back for Moore's ticket. (*Id*.) George met Wint when they were both in high

school at the technical school where George's father was the superintendent.  (*Id*.)  George and Wint's friendship continued when George moved to Brooklyn.  (*Id*.)  George stated that he never had any conversations with Wint about bringing drugs back from Trinidad.  (Tr. at 282.)

George flew from New York because he could find no direct flights from Baltimore to Trinidad.  (Tr. at 282-83.) When George checked his bag at JFK for his departure to Trinidad, he noticed the bag had a small rip in it.  (Tr. at 283.)  When he arrived at Tobago, after a connecting flight from Trinidad, he noticed a large rip in the bag and determined he would not be able to use it on his return trip to the United States.  (Tr. at 283-84.)

After he arrived in Tobago, he went to his sister's house to visit with family members.  (Tr. at 284-85.)  The next day, a Thursday, George went to the Inland Revenue Office to inquire about his tax bill.  (Tr. at 286.)  The person in charge of George's tax matter was not in the office, but was returning on Friday.  (*Id*.)  On Friday, instead of going to the Inland Revenue Office, George visited with family and friends in Trinidad.  (Tr. at 286-87.)

When he returned to Trinidad, he saw some friends, including an individual named Mike Jones ("Jones").  (Tr. at 288.)  George and Jones were high school friends and had last seen each other in 1997.  (*Id*.)  George asked if any of his friends could lend him a suitcase.  (*Id*.)  George said he did not purchase a new suitcase because they are very expensive in Trinidad.  (Tr. at 288-89.)  Jones offered to lend George a suitcase.  (Tr. at 289-90.)  George told Jones that he would be returning to Trinidad in August and that he could bring the suitcase back with him; Jones told George that his half-sister lives in Washington D.C. and that she could pick it up from George after his return to the United States.  (Tr. at 290.)

On Monday, George returned to the Inland Revenue Office to address his tax liability, but was told he needed to stay in Trinidad for the week to resolve the matter.  (Tr. at 291.)  George

said that he was leaving the next day and he was told he could resolve the tax matter, if he returned in May.  (Tr. at 291-92.)  On Monday, George also obtained his children's birth certificates and took care of some banking matters.  (Tr. at 292.)  George then picked up the suitcase from Jones and did not notice anything unusual about its weight.  (Tr. at 292-93.)  George returned to his sister's house and packed the suitcase.  (Tr. at 293.)  The next day, George flew back to JFK.  (*Id.*)  George concluded his direct examination by stating he never used or sold drugs, had never been convicted of a crime, and that he never would willingly transport drugs on behalf of another.  (Tr. at 293-94.)

During cross examination, the government asked George questions about his interaction with CBP officers at JFK.  The government asked George, "You also stated [to the CBP officer] that the bag was your bag, correct?"  (Tr. at 299.)  George responded "No sir."  (*Id.*)  However, immediately thereafter George said, "The question [the officer] asked me, he said, 'Is the bag yours?' And I said yes, but ultimately it is not my bag. I borrowed the bag."  (*Id.*)  George then conceded that he never told the officer that he borrowed the bag and that he did tell the officer that he packed the bag himself.  (*Id.*)  George testified further that, before he packed the suitcase in Trinidad, the suitcase was completely empty.  (Tr. at 302.)  Moreover, when he picked up the suitcase from Jones, it had the "the weight of any normal suitcase."  (Tr. at 302-03.)

George testified that at some point during the CBP officer's questioning, the CBP officer cut a hole in the bottom of George's bag and white powered came out of the hole.  (Tr. at 303.)  George explained that he was in shock and, as a result, he did not say a word after seeing the powder.  (*Id.*)  The government then asked, "You put your head down, is that correct?"  George denied putting his head down, stating he was in shock and in a daze.  (Tr. at 304.)

The government then asked George about the customs declaration form he filled out prior to his arrival at JFK. George acknowledged that the CBP officer found food in George's bag. (Tr. at 300-01.) However, George marked on the customs declaration form that he had no food in his bag and admitted it was not true. (Tr. at 304-305.)

George acknowledged that Wint purchased the tickets for George and Moore seven days before the intended departure, even though Wint had never met Moore. (Tr. at 307.) Noting that George had testified that he borrowed the money to purchase the tickets from Wint because he did not have enough funds to purchase the tickets, and that George's girlfriend earned between $91,000 and $151,000 annually, the prosecutor asked whether George had asked his girlfriend to pay for his plane tickets. (Tr. at 308.) George responded he had not. Despite the fact that Wint lived four states away, George asked him to pay for the tickets because "[h]e is my friend and I ask him for a favor. He would grant me a favor no matter what." (*Id*.)

As to his finances, George testifed that he had a debit card and acknowledged that, shortly before, the trip he spent $80 on a massage and $151 on a cellular phone bill. (Tr. at 309-11.) George explained that the massage was for physical therapy. (Tr. at 313.) While in Trinidad, George also purchased a SIM card for 100 dollars in Trinidadian currency to use in one of the two cell phones he owned. (Tr. at 311-13.) At the time of his arrest, George was in possession of an iPhone, which he owned, and a T-Mobile phone, which he stated he borrowed from his sister. (Tr. at 312.) George used his iPhone while in Trinidad to receive phone calls and to send and receive text messages. (Tr. at 320.) Specifically, George acknowledged he received text messages from Wint. (Tr. at 321.)

During re-direct examination, George explained that he did not ask to borrow money from his girlfriend because her daughter's college tuition is very expensive and he thought it

would be unfair to ask her for the money.  (Tr. at 325.)  George asked Wint because he knew that Wint would lend him the money.  (*Id*.)  He also stated that at the time he purchased the massage and paid his cell phone bill, he did not have enough money in his account to purchase the airline tickets.  (Tr. at 325-36.)  He also testified that his doctor directed him to get the massage because of the injuries he sustained in the car accident.  (Tr. at 326.)  George also explained, regarding his tax liability, that his intention upon arriving in Trinidad was to collect all the information possible to see whether the bill was accurate.  If the bill seemed accurate he would make arrangements to pay the bill.  (Tr. at 326-27.)  Finally, George explained that he had two cellphones, one of which was a pre-paid phone, and that the pre-paid phone was the only way he could get in contact with his sons after his divorce.  (Tr. at 327.)

iv.  Marissa George

Marissa, George's daughter, testified that she lived in Brooklyn and worked two jobs while attending college.  (Tr. at 329-30.)  She grew up in Trinidad and has two younger brothers; all three have the same parents.  (Tr. at 330.)  She moved to Brooklyn when she was ten and lived with George and her mother.  (Tr. at 331.)   When she was sixteen, after her parents divorced, she, along with one of her brothers, moved to Maryland where they lived with George for eight years.  (*Id*.)  Her other brother remained with their mother in Brooklyn.  (Tr. at 332.)  Marissa explained that, after the divorce, George had some difficulty in calling her brother in Brooklyn, because their mother's new boyfriend would not allow the brother to talk with George.  (Tr. at 332-33.)  Her mother's boyfriend would often confiscate her brother's cell phone and her mother would look through the phone to see if George had contacted him.  (Tr. at 333.)  Because of this, George gave the children a second phone number at which they could contact him.  (*Id*.)

Marissa also testified that she had discussions with both of her parents about obtaining her birth certificate from Trinidad. (Tr. at 333-34.) She also stated that George was providing her with monthly financial support to help pay her rent. (Tr. at 334.) She concluded her testimony by stating that, based on her knowledge of her father, she did not believe her father was involved in narcotics trafficking because "[h]e is a hard working person" and he would not do anything illegal. (Tr. at 335.)

## II.     RULE 29 MOTION FOR A JUDGMENT OF ACQUITTAL

Rule 29 provides that, on a defendant's motion after a jury verdict is rendered, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). Defendant argues there was insufficient evidence to sustain his conviction. The government asserts there was more than sufficient evidence presented at trial to sustain the conviction. For the reasons set forth below, Defendant's motion is denied.

### A.   *Rule 29 Legal Standard*

Rule 29 "imposes a heavy burden on the defendant, whose conviction must be affirmed 'if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]'" *United States v. Cote*, 544 F. 3d 88, 98 (2d Cir. 2008) (citation omitted). A court's conclusion that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt" must be based on its consideration of "all of the evidence, direct and circumstantial[.]" *United States v. Eppolito*, 543 F. 3d 25, 45 (2d Cir. 2008) (citation omitted).

On a post-verdict motion for a judgment of acquittal, a trial court may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Cote*, 544 F. 3d at 99 (internal quotation and typographical marks omitted).

Instead, "[t]he court must give full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the government." *Id.* In other words, the court must "[v]iew[ ] the evidence in the light most favorable to the government," which means "crediting every inference that the jury may have drawn in favor of the government, and recognizing that the government's evidence need not exclude every other possible hypothesis." *Eppolito*, 543 F. 3d at 45 (internal quotation marks and citations omitted). However, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Lorenzo*, 534 F. 3d 153, 159 (2d Cir. 2008) (internal quotation marks and citations omitted).

### B. Rule 29 Analysis

In his Rule 29 motion,[1] Defendant asserts that the evidence submitted at trial was insufficient to convict him of either charge because the government did not prove Defendant knowingly and intentionally imported or possessed the cocaine at issue.[2] The crux of Defendant's argument is that the circumstantial evidence the government presented was insufficient to prove Defendant's knowledge and intent because Defendant's own evidence provided innocent explanations for each negative inference the government asked the jury to draw, and, therefore, no rational jury could have convicted him. (*See* Def. Mem. at 8-9.)

Defendant's argument boils down to the assertion that his evidence and witnesses were more credible than the evidence and witnesses the government presented. Accordingly,

---

[1] Defendant previously moved for a Rule 29 judgment of acquittal at the end of the government's case, which the court denied, and Defendant renewed the motion at the close of all evidence, which the court also denied. (*See* Tr. at 215-16, 371.)

[2] Defendant concedes the only disputed issue at trial was his knowledge as to the presence of the cocaine. (*See* Def. Mem. at 2.)

Defendant implicitly asks the court to re-weigh the evidence, particularly with respect to the credibility of witnesses, and reach a conclusion contrary to that of the jury. This the court cannot do. Determining witness credibility and weighing evidence are solely within the province of the jury and, especially in the context of a Rule 29 motion, it is improper for a court to substitute its own evidentiary assessments for those made by the jury. *See United States v. Payne*, 591 F. 3d 46, 59-60 (2d Cir. 2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury."); *United States v. Jackson*, 335 F. 3d 170, 180 (2d Cir. 2003) (citing *United States v. Martinez*, 54 F. 3d 1040, 1043 (2d Cir.1995)) ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn in favor of the government."); *United States v. Miller*, 116 F. 3d 641, 676 (2d Cir. 1997) ("[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses [.]"); *see also United States v. Guadagna*, 183 F. 3d 122, 129 (2d Cir. 1999) ("When ruling on a motion for acquittal the court must be careful to avoid usurping the role of the jury.").

Here, the government presented evidence that Defendant: (1) checked the suitcase containing the cocaine in the Trinidad airport; (2) retrieved the suitcase from the baggage carousel at JFK; (3) told CBP officers that the suitcase was his; (4) told CBP officers that he had packed the bag himself; (5) became visibly nervous, started talking quickly, and asking questions once CBP Officer Mackesy emptied the suitcase a second time to inspect it more closely; (6) began standing closely over the suitcase when Mackesy commenced his second inspection; and (7) hung his head in silence after the CBP officers discovered the cocaine. Most important was Mackesy's observation that Defendant's suitcase was substantially heavier than similar bags as there was nearly four pounds of cocaine secreted in the sides of Defendant's luggage. Finally,

the government presented testimony from Officers Mackesy and Ramirez that, after they cut Defendant's suitcase with a knife, white powder, later identified as cocaine, leaked out of the luggage. This was more than sufficient evidence from which a reasonable jury could have found that Defendant knew the cocaine was in his suitcase. *See United States v. Forlorma*, 94 F. 3d 91, 93 (2d Cir. 1996) ("[Defendant's] possession of the heroin concealed in his baggage, coupled with his acknowledgement that the baggage was his and that he owned the contents, and with his visible nervousness during the search, were more than legally sufficient to establish his guilt.").

Notably, Defendant testified at trial and provided his own explanation for the presence of the cocaine in his suitcase, which the jury clearly rejected. A jury is entitled to disbelieve a defendant's exculpatory explanation and the incredibility of that explanation might unintentionally bolster the government's case. *United States v. Tran*, 519 F. 3d 98, 106 (2d Cir. 2008) (citations omitted). Here, Defendant testified, among other things, that he had traveled from Trinidad to the United States with the suitcase in which the cocaine was secreted, but explained that the suitcase actually was not his and that he was not aware of the presence of the cocaine until the day he was arrested. (Tr. at 266-68.) He claimed his original suitcase ripped on the trip to Trinidad and he could not afford to purchase a new one, so, instead, he borrowed the suitcase from "Mike Jones," a friend whom he had last seen sometime in 1997. (Tr. at 266, 287-90.) Mike Jones allegedly told Defendant his relative would retrieve the suitcase from Defendant when he returned to the United States. (Tr. at 290.) Defendant's testimony placed his credibility in issue and a reasonable jury could have found his explanation not only incredible, but that it further supported the conclusion that he knew the cocaine was secreted inside the suitcase. *See Tran*, 519 F. 3d at 106 (Defendant placed his credibility at issue by testifying he was unaware of the presence of contraband found in his vehicle and a reasonable jury could have

found the testimony incredible); *see also Forlorma*, 94 F. 3d at 93 ("[T]he jury was perfectly entitled to discredit [the defendant's] claims of ignorance [about the presence of heroin in his suitcase], especially because the testimony about his nervousness tended to contradict his claim.").

Defendant further asserts that acquittal is warranted because the government's emphasis, in its closing, on Defendant's silence when the drugs were discovered demonstrates the weakness and insufficiency of the government's evidence. (*See* Def. Mem. at 9-10.) This claim is without merit. The government argued during its closing that Defendant's silence was probative of his knowledge of the cocaine. (Tr. at 378, 408.) In contrast, Defendant argued in his closing, as he was entitled to do, that his silence was not probative of his knowledge of the cocaine, but rather was indicative of his shock at the discovery of the cocaine. (*See* Tr. at 396-97.) The jury, during its deliberation, weighed these competing arguments and apparently chose to disbelieve Defendant, as is evidenced by the guilty verdict. Nonetheless, Defendant now reasserts the same argument that he raised during his closing and asks this court to acquit him based on the court's own assessment of the competing inferences each party previously asked the jury to draw from Defendant's silence. (*See* Def. Mem. at 9.) As discussed above, such assessments are solely within the province of the jury. *See Payne*, 591 F. 3d at 59-60. The jury was entitled to draw the inference from Defendant's silence, along with the totality of additional evidence presented, that Defendant knew the cocaine was secreted in his suitcase.

Relying on *Doyle v. Ohio,* 426 U.S. 610 (1976) and *United States v. Hale*, 422 U.S. 171 (1975), Defendant further contends that the government's emphasis on Defendant's silence warrants acquittal. Defendant relies on dicta in *Doyle*, where the Supreme Court noted that "silence at the time of arrest [is] likely to be ambiguous and thus of dubious probative value."

426 U.S. at 619 n.8.  However, Defendant's reliance on *Doyle* and *Hale* is inapposite because, as Defendant readily concedes, the holding of those cases are limited to post-*Miranda* silence. (Def. Mem. at 9.)  Here, Defendant was not yet under arrest or subject to custodial interrogation at the time of his silence.  Notably, as Defendant also concedes, the Second Circuit has held that where, as here, a defendant testifies at trial, his pre-arrest silence is admissible.  (*See* Def. Mem. at 10 n.8 (citing *United States v. Caro*, 637 F. 2d 869, 876 (2d Cir. 1981)).  Nonetheless, Defendant argues that evidence of Defendant's silence should have been excluded pursuant to Federal Rule of Evidence 403. (Def. Mem. at 10 n.8; Reply Mem. in Further Supp. of Def.'s Mot. for New Trial ("Def. Rep.") at 10.)  This argument is unavailing, as Defendant never moved to exclude the evidence during trial nor did he seek a limiting instruction.

Thus, after reviewing the evidence in its totality, in the light most favorable to the government, the court finds that a rational trier of fact could have determined that the essential elements of the crimes of conviction were established by the government beyond a reasonable doubt.  Accordingly, Defendant's Rule 29 motion is denied.  *See Lorenzo*, 534 F. 3d at 159.

## III.    RULE 33 MOTION FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM P. 33.  Defendant argues a new trial is warranted here because of alleged prosecutorial misconduct during summation.  The government counters that, if any misconduct did occur during summation, it did not rise to the level of "manifest injustice," as is required on a Rule 33 motion, and, therefore, a new trial is not warranted.  For the reasons set forth below, Defendant's Rule 33 motion is denied.

### A. Rule 33 Legal Standard

Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F. 3d 142, 159 (2d Cir. 2009) (internal quotation marks omitted). However, "[t]he defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F. 3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). Indeed, the "ultimate test" on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Canova*, 412 F. 3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted). When deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," and be satisfied that "competent, satisfactory and sufficient evidence in the record supports the jury verdict." *United States v. Ferguson*, 246 F. 3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted). However, "courts must . . . exercise Rule 33 authority sparingly and in the most extraordinary circumstances," such as where "a district court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Cote*, 544 F. 3d at 101 (internal quotation marks omitted).

### B. Prosecutorial Misconduct Legal Standard

A defendant bears a substantial burden when arguing for a new trial based on prosecutorial misconduct in the summation. *United States v. Caracappa*, 614 F. 3d 30, 41 (2d Cir. 2010) (citations omitted). A criminal conviction arising from an otherwise fair trial will not be reversed solely on the basis of inappropriate prosecutorial comments. *See United States v. Beridze*, 415 F. App'x 320, 327 (2d Cir. 2011) (citing *United States v. Thomas,* 377 F. 3d 232,

244 (2d Cir. 2004)).  Rather, "[f]laws in the government's summation will require a new trial only in the rare case in which improper statements – viewed against the entire argument to the jury – can be said to have deprived the defendant of a fair trial."  *Caracappa*, 614 F. 3d at 41 (citations omitted); *see also United States v. Coriaty*, 300 F. 3d 244, 255 (2d Cir. 2002) ("Before a conviction will be reversed, a prosecutor's comments upon summation must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974))); *Forlorma*, 94 F. 3d at 94 ("Reversal is warranted only where 'the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'" (quoting *United States v. Pena*, 793 F. 2d 486, 490 (2d Cir. 1986))); *United States v. Locascio*, 6 F. 3d 924, 945 (2d Cir. 1993) (citation omitted) (Prosecutorial misconduct must be "so severe and significant as to result in the denial of [the defendant's] right to a fair trial.").  In determining whether an inappropriate remark amounts to prejudicial error, a court must consider: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct.  *See Caracappa*, 614 F. 3d at 41 (citation omitted).

### C.  Analysis

Defendant argues the government made a number of improper comments during summation warranting a new trial.  Specifically, Defendant alleges the government: (1) made reference to statements stricken from evidence; (2) misstated trial testimony; (3) asked the jury to consider facts outside the record; (4) improperly impeached defendant by omission; and (5) made statements which shifted the burden of proof.

#### i.  Statements Stricken from Evidence

In describing Defendant's demeanor on direct examination Officer Mackesy stated, "It

seemed to me as [if] he was trying to distract me, have my eyes go away from the bag." (Tr. at 60.) Defendant immediately objected and moved to strike. The court sustained the objection and the statement was stricken from the record. (*Id.*) During summation, the Assistant United States Attorney ("AUSA") explicitly referenced the stricken testimony when he stated: "And Officer Mackesy told you that he felt as if the defendant was trying to get him to look up at him and away from the suitcase. Of course the defendant was trying to do that, because he knew he was about to be caught." (Tr. at 380.) After summations, but not immediately after the statement was made, Defendant objected to the AUSA's statement and asked the court to issue curative instructions, which the court did. (Tr. at 410-412.) Defendant now argues, despite the instructions, that the AUSA's statement was so prejudicial and devastating to the defense, when seen in the light of what Defendant characterizes as a "weak case," that he was deprived of a fair trial. (*See* Def. Mem. at 12-17.) The court disagrees.

### a. The Severity of the Misconduct

As the government concedes, its reference to facts not in evidence was improper. (*See* Dkt. Entry 52, Gov't's Mem. of Law in Resp. to Def.'s Mot. in Supp. of Acquittal or a New Trial ("Gov't. Mem.") at 23-24.) *See also United States v. Smith,* 778 F. 2d 925, 929 (2d Cir. 1986) (improper to misstate evidence or refer to facts not in evidence during summation). But the severity of the misconduct here was not great. Factors courts consider in determining the severity of misconduct include, *inter alia*, the extent to which the misconduct was intentional and whether the improper comments were "'minor aberrations in a prolonged trial' or 'cumulative evidence of a proceeding dominated by passion and prejudice.'" *United States v. Modica*, 663 F. 2d 1173, 1181 (2d Cir. 1981) (internal citations omitted). Here, the AUSA's remark was improvident, but, as the government asserts, and Defendant acknowledges, the statement was

neither intentional nor made in "bad faith." (Tr. at 410; Gov't. Mem. at 25; Def. Mem. at 13.) Moreover, the alleged misconduct was confined to the prosecutor's summation, the officer's stricken statement was mentioned briefly, and the trial was not one otherwise "marked by passion and prejudice." *Modica*, 663 F. 2d at 1181 (trial not marked by passion and prejudice, hence misconduct not severe, where prosecutor's offending behavior was confined to his summation, his opening statement and conduct throughout the six-day trial were free of improper remarks, and prosecutor did not disregard rulings of the court); *cf. Forlorma*, 94 F. 3d at 95 (prosecutor's misconduct severe where "inaccurate assertion was uttered not once but three times" with strong emphasis).

### b. Measures Adopted to Cure the Misconduct

Where evidence of guilt is otherwise strong, the prejudice caused by a prosecutor's reference, during summation, to facts not in evidence can be alleviated if the court issues detailed curative instructions explaining that summations are not evidence and that the jury is the sole judge of the facts. *See Gonzalez v. Sullivan*, 934 F. 2d 419, 424 (2d Cir. 1991); *see also Vigil v. Rivera*, 2008 WL 1902687, at *14 (E.D.N.Y. Apr. 25, 2008) (citing *United States v. Rivera,* 971 F. 2d 876, 884-85 (2d Cir. 1992)) (concluding the court's instructions cured any prejudice arising from prosecutorial error). Further, a court must assume "that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant." *United States v. Elfgeeh*, 515 F. 3d 100, 126-27 (2d Cir. 2008) (citing *Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987) (internal quotation marks omitted)). Defendant argues, in reliance on *Forlorma*, a similar drug courier case wherein the only disputed issue also was whether the defendant knew drugs

were in his suitcase, that the curative instructions issued by this court were insufficient to "undo the effect of [the AUSA's] highly prejudicial inaccurate argument" because the AUSA's remark was "particularly devastating and effectively incurable." (Def. Mem. at 14-15 (citing *Forlorma*, 94 F. 3d at 95); Def. Rep. at 8.)  The court disagrees.

As an initial matter, there is nothing that suggests the jury was unable to follow the court's detailed and extensive curative instructions described more fully below.  Further, as already discussed *supra* in Section II.B, while a close case, there was more than sufficient evidence from which the jury could find, beyond a reasonable doubt, each element of the crimes charged against Defendant.  Moreover, *Forlorma* is readily distinguishable from the instant case.  In *Forlorma*, the prosecutor made repeated references to facts not in evidence and, when the defendant objected, the trial court only offered very short and undetailed curative instructions.  94 F. 3d at 94.  The Second Circuit found the instructions were not sufficient to "dispel[] the misperception that was likely caused by" the prosecutor's improper comments and concluded that "[i]n these confusing circumstances, we do not think these rulings and instructions were sufficient to undo the effect of the highly prejudicial inaccurate argument." *Id.* at 95.  The Court thus found the defendant in *Forlorma* had been prejudiced by the combination of the prosecutor's multiple references to facts not in evidence and the district court's inadequate curative instructions.

Here, the AUSA referenced Officer Mackesy's testimony only briefly during his summation and the court issued curative instructions immediately upon the close of summation, at Defendant's request, and again during the final jury charge, which were much more extensive, detailed and explicit than the terse instructions given in *Forlorma*.  Specifically, the court instructed the jury, *inter alia*, that: (1) closing arguments are not evidence; (2) the jury could not

consider Officer Mackesy's stricken testimony as evidence; and (3) the jury's recollection of the testimony is what always controls. (Tr. at 411-412.) A short time later, during final instructions, the court also reminded the jury that "[a]rguments or statements by the attorneys are not evidence" and that "[a]ny testimony stricken by the court is not evidence." (Tr. at 418, 420.)

Accordingly, in light of the sufficiency of the evidence, the brevity of the AUSA's reference to Officer Mackesy's testimony, and the court's immediate detailed curative instructions, Defendant's claim that the court's instructions were insufficient to alleviate the prejudicial statement is without merit. *See Sullivan*, 934 F. 2d at 424; *Rivera,* 971 F. 2d at 884-85 (despite prosecutor's improper statements during summation, no prejudice to defendant where case against defendant was strong and court sustained defense objections and instructed jury that the summations were not evidence).

### c. Certainty of Conviction Absent the Misconduct

Defendant asserts, based on *United States v. Kaplan*, 490 F. 3d 110 (2d Cir. 2007) and again on *United States v. Forlorma*, 94 F. 3d 91 (2d Cir. 1996), that this was a "marginal circumstantial case" and, thus, there is no certainty Defendant would have been convicted absent the government's reference to Officer Mackesy's stricken testimony. (Def. Mem. at 15-17.) Specifically, Defendant claims that Officer Mackesy's stricken statements constituted improper lay "opinion testimony" about Defendant's knowledge of drugs in his suitcase, and because the "opinion testimony" related to the only contested issue at trial, then, pursuant to *Kaplan* and *Forlorma*, the stricken testimony was likely "devastating to [Defendant's] defense" and, therefore, a new trial is warranted. (Def. Mem. at 15-16; Def. Rep. at 10.) The government argues the reference to Officer Mackesy's testimony likely had no effect on the outcome of the trial. The court finds *Kaplan* and *Forlorma* inapplicable to the instant case.

In *Kaplan*, during the defendant's trial for insurance fraud, the district court admitted into evidence a cooperating witness' lay opinion regarding the defendant's knowledge of the fraud, over the defendant's objections. 490 F. 3d at 117. The Second Circuit concluded the admission of the opinion testimony was reversible error because the government's case was otherwise not strong and, because the lay opinion addressed the "central disputed issue in the case," the testimony was "just the sort of evidence that might well sway a jury confronted with a marginal circumstantial case." *Id.* at 123. Central to the Court's conclusion that the lay opinion "substantially swayed" the jury's verdict was the government's trial strategy of repeatedly calling the jury's attention to the lay opinion testimony. *Id.* In fact, the lay opinion was a fundamental component of the government's case, as it emphasized the testimony in its opening statements, brought it up on direct examination, and then emphasized it again in both closing and rebuttal arguments. *Id.* Moreover, the Court noted that the lay opinion was unique and "not cumulative of properly admitted evidence." *Id.* at 124.

Here, first and foremost, Kaplan is distinguishable because Officer Mackesy's testimony[3] was never admitted at trial; the court *sustained* Defendant's objection to the testimony during direct examination and, as addressed *supra*, the court explicitly instructed the jury several times that it could not consider the testimony as evidence during its deliberations. Moreover, unlike in *Kaplan*, the government here did not make Officer Mackey's testimony the essential element of

---

[3] The court is not convinced that Defendant's characterization of Officer Mackesy's testimony as lay opinion testimony is proper, which further dilutes any similarity between *Kaplan* and the instant matter. In *Kaplan*, the witness specifically opined as to the defendant's knowledge and gave grounds for the basis of his opinion. 490 F. 3d at 119. Here, despite Defendant's initial characterization of Officer Mackesy's testimony as "nothing less than opinion testimony … that [Defendant] knew there were drugs in his suitcase," (Def. Mem. at 15), Defendant himself concedes "Officer Mackesy did not explicitly state [Defendant] knew there were drugs in his suitcase[.]" (*Id.* at 16.) Nonetheless, Defendant maintains that such inference was compelled by the testimony. (*Id.*).

its proof as to Defendant's knowledge, but referenced it unintentionally and only briefly during summation. Finally, unlike *Kaplan*, where the lay opinion was unique evidence, the government here presented additional evidence from which the jury could have inferred Defendant's knowledge regarding the drugs in his suitcase. As previously discussed in more detail *supra* in Section II.B, Defendant's change in demeanor during Officer Mackesy's second inspection of the unusually heavy empty suitcase, his becoming visibly nervous and talking very quickly, *inter alia*, was properly before the jury. The jury reasonably could have inferred Defendant's knowledge of the drugs from this evidence.

Defendant's reliance on *Forlorma* is equally inapposite as applied to the instant case, because, as discussed *supra*, the error in *Forlorma* was caused by the government's multiple references to facts not in evidence and the trial court's failure to provide adequate curative instructions. Here, for the reasons addressed above, the court's instructions mitigated the prejudice of the instant AUSA's statements. Moreover, there were additional facts in evidence, such as Defendant's admission that the suitcase he packed himself was his, Defendant's retrieval of the suitcase from the baggage claim area, and his lie about lack of food in his baggage (which would have resulted in an immediate search), as well as his demeanor, from which the jury could have reasonably inferred Defendant's knowledge of the presence of drugs in his luggage.

Defendant also claims that the prejudice of the stricken testimony was greatly magnified because Defendant, as part of his trial strategy, sought to endorse and credit the majority of Officer Mackesy's testimony and, therefore, the stricken testimony was far more damaging than if Defendant had challenged Mackesy's credibility. This argument is unavailing because it was Defendant's choice to credit the testimony. Defendant had every opportunity to cross-examine each witness and to attack their credibility; his choice to do otherwise is not sufficient grounds to

grant a new trial. Accordingly, the government's reference to the stricken testimony, while improper, does not rise to the level of misconduct requiring a new trial.

ii. Remaining allegations

Defendant raises the remaining allegations of prosecutorial misconduct for the first time in this instant Rule 33 motion and made no contemporaneous objections to the conduct during trial. A defense counsel's failure to contemporaneously object to alleged prosecutorial misconduct generally indicates that defense counsel did not believe the conduct was prejudicial. *See United States v. Quinones*, 511 F. 3d 289, 308 (2d Cir. 2007) (Where prosecutor's misconduct "did not prompt a contemporaneous objection," failure to object was "an indication that the incident did not affect the trial atmosphere in a manner disadvantageous to" the defendant. (quoting *United States v. Walker*, 191 F. 3d 326, 337 (2d. Cir 1999))); *see also United States v. Canniff*, 521 F. 2d 565, 572 (2d Cir. 1975) (internal citations omitted) (The failure to object to alleged misconduct "indicates counsel's own difficulty in finding any prejudice."). Thus, where a defendant raises objections to a prosecutor's conduct for the first time in a post-trial motion, the conduct is evaluated "using plain error analysis" [4] and relief is not due unless

---

[4] Because district courts perform a quasi-appellate role when reviewing objections to prosecutorial misconduct first raised during a Rule 33 motion, the courts review for plain error under Federal Rule of Criminal Procedure 52(b). *See United States v. Yevakpor*, 501 F. Supp. 2d 330, 334 (N.D.N.Y. 2006) (citing cases) (courts have found objections not raised at trial and first brought up in a Rule 33 motion are reviewed under plain error standard); *see also United States v. Heron*, 525 F. Supp. 2d 729, 751 n. 48 (E.D.Pa. 2007) ("Although plain error analysis is usually the province of the Court of Appeals, [Fed.R.Crim.P. 52(b)] – which is contained in the Federal Rules of Criminal Procedure, not the Federal Rules of Appellate Procedure – is not limited to appellate practice."), *rev'd on other grounds*, 323 F. App'x 150 (3rd Cir. 2009); *United States v. Brandao*, 448 F. Supp. 2d 311, 318 (D.Mass. 2006) (citing cases) ("[I]t is not unprecedented for a trial court to apply the plain error standard to an objection raised for the first time in a post-trial motion, because at that stage, the court 'performs something of an appellate role.'"); *United States v. Washington*, 263 F. Supp. 2d 413, 426 n. 7 (D.Conn. 2003) (citing cases) (Because the court "performs somewhat of an appellate role" when reviewing claims of prosecutorial misconduct to which no objections are raised during trial, but which are brought for

the conduct amounts to "flagrant abuse causing substantial prejudice.'" *United States v. Holmes*, 421 F. App'x 76, 80 (2d Cir. 2011) (citing *United States v. Carr,* 424 F. 3d 213, 227 (2d Cir. 2005)). *See also United States v. Beridze*, 415 F. App'x 320, 327 (2d Cir. 2011) (when defendant did not object during prosecutor's alleged improper arguments to the jury, a criminal conviction will only be reversed where the statements constituted "flagrant abuse" which caused "substantial prejudice"); *United States v. Ghailani*, 761 F. Supp. 2d 167, 198 (S.D.N.Y. 2011) (objection to prosecutor's comment raised for the first time during post-trial motion, even if comment was inappropriate, warrants relief only if comment amounted to "flagrant abuse"). Plain error occurs where: (1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States v. Williams*, 399 F. 3d 450, 454 (2d. Cir 2005) (quoting *United States v. Cotton,* 535 U.S. 625, 631-32 (2002)). Even assuming the impropriety of the prosecutor's remaining comments to which Defendant now objects, the court does not find the comments rise to the level of plain error and flagrant abuse causing substantial prejudice. As such, Defendant's remaining claims are without merit.

### a. Misstatement of Trial Testimony

During direct examination, Officer Mackesy testified that Defendant asked a number of questions while the officer searched the suitcase, including inquiring about how to get to the bus terminal. (Tr. at 59.) On cross examination, Defendant denied asking that question. (Tr. at 318.) During summation, the government incorrectly stated, "The defendant says that he asked the officer if he knew where the bus terminal was. The defendant knew where the bus terminal was." (Tr. at 379.) Defendant argues that this misstatement, when combined with the

---

the first time on a Rule 33 motion, the trial court will review the alleged misconduct for plain error under FED. R. CRIM. P. 52(b).).

government's reference to Officer Mackesy's stricken testimony, was a totally inaccurate characterization of the evidence, which prejudiced Defendant. (Def. Rep. at 5-6.) The government argues that when the statement is put in context, it is clear that the AUSA intended to attribute the statement to Officer Mackesy and not Defendant but that the AUSA merely misspoke. (Gov't. Mem. at 34 (citing Tr. at 379).) Accordingly, the government argues the misstatement, while a mistake, was neither plain error nor flagrant abuse. (*Id.* at 35.) The court finds the AUSA's misstatement constituted neither plain error nor flagrant abuse.

Here, the court instructed the jury, prior to summations and in the final charge that: (1) arguments and statements by counsel are not evidence and that the jury may accept or reject the arguments in whole or in part; and (2) that the jurors alone are sole and exclusive judges of the facts in the case. (Tr. at 372, 414, 418.) Accordingly, while the court finds that the government did misstate testimony, when viewed against the entire argument to the jury and placed in context of the court's instructions and the sufficiency of the evidence, the misstatement was not plain error or flagrant abuse warranting a new trial. *See, e.g., United States v. Millar*, 79 F. 3d 338, 343–44 (2d Cir. 1996) (prosecutor's comments that defense was "hog wash" and that defense counsel had created "smoke screen" and was attempting to "confuse" the jury and "lead them astray" did not amount to flagrant abuse under plain error analysis); *but cf. Floyd v. Meachum*, 907 F. 2d 347 (2d Cir. 1990) (new trial ordered where prosecutorial misconduct escalated from initial to closing summation and included, *inter alia*, inflammatory comments and erroneous statements of law implicating defendant's constitutional right to remain silent; prosecutor personally vouched for credibility of state's main witness; and improperly called non-testifying defendant a liar over thirty times).

*b. Facts Outside the Record*

Defendant also complains he was prejudiced when the government invited the jury to speculate about facts outside the record, and that this error, when compounded with the other alleged misconduct, constitutes substantial prejudice warranting a new trial. (Def. Mem. at 17; Def. Rep. at 6-7.) Specifically, Defendant testified he flew to Trinidad on a direct flight from JFK because it was cheaper than a connecting flight from Baltimore. (Tr. at 314-315.) During summation, the AUSA asked, rhetorically, "And ladies and gentlemen, you are entitled to use your own experiences in your deliberations. Do you really think that a connected flight is more expensive than a premium direct flight between two destinations?" (Tr. at 386.) The government argues that the statement did not constitute error, but was proper argument merely asking the jury to rely on its common knowledge and experience. (Gov't. Mem. at 32-33.)

The court found that this statement was improper and immediately, *sua sponte*, without objection by defense counsel, issued the following instruction: "There has been no evidence about pricing of connecting flights or direct flights and the jury can't speculate. The jury can only make its decision based on the evidence that has been presented." (Tr. at 386-387.) While the statement was error, in light of the court's immediate and detailed *sua sponte* curative instruction and the sufficiency of the evidence, it does not rise to the level of plain error or flagrant abuse warranting a new trial. *See, e.g., United States v. Holmes,* 421 F. App'x 76, 79-81 (2d Cir. 2011) (no flagrant abuse where government improperly characterized defense counsel as "a pickpocket's accomplice" during rebuttal summation, given the strong evidence against defendant); *but cf. United States v. Farmer,* 583 F. 3d 131, 147 (2d Cir. 2009) (flagrant abuse where prosecutor tactically misused defendant's nickname, "Murder," no fewer than thirty times during the rebuttal summation in murder trial, which invited jurors to infer the defendant earned

the nickname as a result of his propensity to commit murder).

c. Impeachment by Omission and Burden Shifting

*c. Impeachment by Omission and Burden Shifting*

Finally, Defendant complains that two comments the AUSA made during summation, one of which constituted impeachment by omission, improperly shifted the burden of proof. (Def. Mem. at 17; Def. Rep. at 7-8.)  First, Mr. Gregory Wint, a defense witness, testified on direct as to certain cellular phone text messages he sent Defendant, and that he had asked Defendant to deliver "the bottom part of a mop stick" to the witness' brother in Trinidad.  (Tr. at 252.)  Later, on cross-examination, the AUSA asked Defendant, "But you didn't mention during your direct testimony when you delivered the mop, did you?"  (Tr. at 321.)  Defense counsel immediately objected and the court sustained the objection.  (*Id.*)  During summation, the AUSA stated that, during Defendant's testimony, "He never once mentioned the mop or where he delivered it."  (Tr. at 387.)    Second, the AUSA, after commenting on undisputed evidence, asked, "So what is the defendant left with? The unluckiest man in the world defense . . . that he was an unwitting dupe, that he was the unluckiest man in the world." (Tr. at 377.)  Defendant argues these two comments, when combined, had the effect of shifting the burden of proof.  The government maintains its statements were fair and unobjectionable comment and that the burden was never shifted.  (Gov't. Mem. at 31, 35.)   The court finds that the statements, even in combination, did not shift the burden and that Defendant's claim is without merit.

Throughout the trial, the court instructed the jury at least seven times, including once immediately following the government's rebuttal case, that the burden of proof remained solely with the government at all times. (Tr. at 19, 23, 408-09, 416, 419, 420.)  Additionally, during summations, the defense reminded the jury three times about the government's burden and the government reiterated the point once as well.  (*See* Tr. at 398, 394, 401, 405.)  Moreover, the

court, in its final charge to the jury repeated several times that the burden of proof was on the government at all times and it never shifts to the Defendant. Accordingly, the jury was told, on more than eleven occasions throughout the trial that the burden rested solely on the government. Thus, assuming *arguendo* that the AUSA's comments were prejudicial, there was no plain error or flagrant abuse because the court's multiple jury instructions as well as the parties' reiteration of the government's burden during summations eliminated any danger that the burden might have been shifted. *See United States v. Mapp*, 170 F. 3d 328, 337–38 (2d Cir. 1999) (prejudice arising from prosecutor's comments that arguably shifted the burden of proof was eliminated where court promptly instructed the jury that the burden never shifts to the defendant).

In sum, while several of the comments the AUSA made during summation may have been imprudent and incautious, when considering the alleged misconduct against the entire facts and circumstances surrounding the trial, the court cannot conclude the statements rise to the level of misconduct that deprived the defendant of a fair trial. Defendant has not sustained his burden in showing that "letting [the] guilty verdict stand would be a manifest injustice." *Canova*, 412 F. 3d at 349. Accordingly, Defendant's Rule 33 motion is denied.

IV.     **CONCLUSION**

For the foregoing reasons, Defendant's Rule 29 and Rule 33 motions are denied and the conviction is affirmed.

SO ORDERED.

Dated: Brooklyn, New York
       June 29, 2012

                                        /s/
                        _____
                        DORA L. IRIZARRY
                        U.S. District Judge